# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CORTNEY BRYANT-EL,         *

v                             *        Civil Action No. CCB-18-1519

DAYENA CORCORAN, et. al.,     *

                                  ***

## <u>MEMORANDUM OPINION</u>

Plaintiff Cortney Bryant-El is an inmate at North Branch Correctional Institution (NBCI) in Cumberland, Maryland. He filed this lawsuit pursuant to 42 U.S.C. §1983, alleging that defendants violated his rights under the First, Eighth and Fourteenth Amendments. Pending is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed by former Commissioner of Correction Dayena Corcoran, Lieutenant Walter Iser, Sergeant William Thomas, C.O. II Brian Fann, C.O. II Bobby J. Ziler, C.O. II Douglas E. Frazee, C.O. II David J. Donaldson, Sr., C.O. II David C. Robey, and C.O. II Charles L. Barb[1] (collectively, the "State Defendants") ECF 25.[2] Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), plaintiff was notified that he may file an opposition with exhibits and affidavits and of the consequences of failing to do

---

[1] The Clerk shall amend the docket to reflect full and proper spelling of all Defendants' names.

[2] On January 30, 2019, the Court granted in part and denied in part the Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF 32, 33. The court dismissed the claims against Tammy Buser and Stacie Mast, and denied summary judgment as to Ryan Browning, LPN, and Dawn Hawk, R.N. *Id.* Dawn Hawk is also known as Dawn Showalter. *See Bryant-El v. Corcoran*, Civil Action No. CCB-17-3675, ECF 27-1; Aff. of Dawn Hawk, ECF 27-5 at pp. 4-6. The court deferred issuing a scheduling order until the claims against the State Defendants were considered. ECF 33.

so. ECF 25. Plaintiff filed an opposition with exhibits.[3] ECF 31. Also pending are plaintiff's Motion to Appoint Counsel, which will be granted, and Motion to Present Additional Evidence, which will be denied. ECF 35, 26.

After reviewing the parties' submissions, the court concludes a hearing is unnecessary at this time. *See* Local R. 105.6 (D. Md. 2018). For reasons to follow, the State Defendants' Motion (ECF 24), treated as a Motion for Summary Judgment, will be granted in part and denied in part.

## BACKGROUND

Plaintiff alleges in his unverified complaint that he was subjected to excessive force, unconstitutional conditions of confinement, and retaliation during and after a January 26, 2017 use of force incident at Western Correctional Institution (WCI). ECF 1. As relief, he is seeking monetary damages and injunctive relief, including an investigation into medical care, and a transfer to a facility away from western Maryland. ECF 1 at pp. 7–10, 22–23, 25–26.

Plaintiff filed with his complaint the declaration of another inmate, Felix Fitzgerald. ECF 1-1. [4] Plaintiff alleges that on January 26, 2017, he and Fitzgerald saw Officer Barb remove chewing tobacco from his mouth and throw it into a trash can. Fitzgerald removed the discarded tobacco from the trash to use as evidence that WCI officers routinely violate the prohibition against using tobacco products in state buildings. Plaintiff and Fitzgerald decided to submit an Administrative Remedy Procedure request ("ARP") about the violation. According to plaintiff

---

[3] Plaintiff also filed a declaration that asks for documents and a copy of the video footage of his cell to show that he was deprived of a mattress and bed linens. ECF 31-1. Importantly, plaintiff's declaration does not verify his allegations are correct and true or otherwise refute the declarations filed by the State Defendants.

[4] Plaintiff and Fitzgerald pleaded guilty in the Circuit Court for Allegany County to assault on a correctional officer based on the incident and each was sentenced to a term of six months of incarceration. ECF 24-39; ECF 24-40; *see* Criminal Case No. C-01-CR-18-000292 (Cir. Ct Allegany Cty.); Criminal Case No. C-01-CR-18-000058 (Cir. Ct Allegany Cty.). Plaintiff is serving a life sentence for first degree murder, armed robbery, and conspiracy to commit armed robbery. ECF 24-32 at pp. 80–84.

and Fitzgerald, Officer Ziler saw Fitzgerald take the discarded tobacco from the trash can. ECF 1 at pp. 2, 4, Fitzgerald Decl. ECF 1-1 at p. 1.

Later that day in the recreation room, plaintiff showed a draft of the ARP and the chewing tobacco to other inmates and then gave the tobacco to Fitzgerald to hold. ECF 1 at p. 4; Fitzgerald Decl. ECF 1-1 at p. 1. At approximately 1:15 p.m., plaintiff saw Officers Ziler, Barb, Frazee, Donaldson, and Robey look into the recreation room, enter the wing, and proceed to the top tier of the wing. Ziler and Robey entered the recreation room and asked the inmates if they were holding "some kind of meeting." ECF 1 at p. 4; Fitzgerald Decl. ECF 1-1 at pp. 1–2. Plaintiff asserts Robey was pointing a can of pepper spray directly at him while Donald pulled the trash bag from the can located in the recreation room. Ziler approached plaintiff, stating "Come with me Bryant. I want to talk to you." ECF 1 at p. 5. When plaintiff asked why, Ziler instructed him to turn around for handcuffing. Plaintiff alleges that after he complied, Ziler stated "We're going to light you up." *Id*; Fitzgerald Decl. ECF 1-1 at p. 2. Plaintiff states this expression alludes to the burning sensation caused by pepper spray and indicated the officers' intent to use it. Plaintiff asserts that Robey moved closer to him while still pointing the can of pepper spray. Plaintiff asked Officer Donaldson "What's this about; me talking about an ARP?" Donaldson answered, "Just go with him and have a quick conversation." ECF 1 at p. 5.

Plaintiff followed Ziler into the recreation room. Ziler said "This is what I want, the tobacco that I saw you grab out of the trash can." *Id*. Plaintiff alleges that when he denied taking the tobacco, Ziler lunged at him with his right hand outstretched as if trying to strike him. Plaintiff moved to avoid getting hit and fell on to the wall. Robey and two other officers then sprayed "copious amounts of the chemical agent" on his face and body. *Id*.

3

Fitzgerald's declaration supports plaintiff's description of the incident. Fitzgerald states he saw Ziler "suddenly strike out at Bryant-El with a jab motion" and Bryant-El "appeared to fall away to avoid being hit." Fitzgerald Decl. ECF 1-1 at p. 2 ¶ 12. Fitzgerald recalls that he saw "Bryant being continuously sprayed with the chemical canisters of 3 correctional officers even though I never saw him attack or even try to hit anyone." Fitzgerald Decl. ECF 1-1 at p. 2 ¶ 13.

Plaintiff alleges that due to the effects of the pepper spray and his chronic asthma, he fled into the recreation room to escape "the inundation of myself from the chemical compound." ECF 1 at p. 5. In his haste to get to a window, plaintiff asserts that he bumped into someone, possibly a correctional officer, but denies he physically harmed, struck, injured or assaulted anyone. Plaintiff asserts an inmate guided him to a window, while another inmate poured water over his head to alleviate the effects of the pepper spray. *Id.* at pp. 5-6.

Defendants Ziler, Barb, Robey, Donaldson, and Frazee dispute plaintiff's account of the use of force incident in their declarations. Barb and Ziler state that on January 26, 2017, they responded to the recreation hall to investigate a large group of inmates gathered inside the top tier recreation hall. In order to speak to plaintiff in a safer environment for staff, they escorted him away from the recreation area. Before exiting the recreation area, plaintiff pulled away and began to assault Officer Ziler with closed fist punches and threw Ziler past Barb on the tier floor. Ziler landed on his shoulder. Barb used his radio to call a staff alert that an assault on staff was in progress. Donaldson and Frazee approached plaintiff to halt his assault on Ziler, and plaintiff began to assault them. Plaintiff struck Donaldson in the head and Frazee on his face with closed fisted punches. Barb states he then administered a one or two second burst of pepper spray in an attempt to end the assault, not to retaliate against plaintiff for filing an ARP, but to stop further assaults on staff. Decl. of Charles Barb, ECF 24-9; Decl. of Bobby Ziler, ECF 24-10; Decl. of

4

David Donaldson, ECF 24-11; Decl. of Douglas Frazee, ECF 24-12; Decl. of David Robey, ECF 24-13.

Robey states that as he left the recreation hall, Fitzgerald struck him in the back of the head. Robey deployed a one second burst of pepper spray to prevent further escalation of the assault. ECF 24-13. Robey denies he used the pepper spray to retaliate against plaintiff for attempting to file an ARP. *Id.*

Ziler and Frazee required medical evaluation outside the facility following the incident. ECF 24-32 at p. 12. Ziler states he has been unable to resume his duties as a WCI correctional officer due to the injuries he received during the assault. ECF 24-10.

Plaintiff alleges that he did not receive a decontamination shower for pepper spray exposure and the "harm" lasted for months. ECF 1 at pp. 7, 21–22. Notably, he does not claim he actually requested a decontamination shower, but rather his need for a shower was obvious and is required by applicable directives. ECF 31 at p. 14.[5] He alleges the pepper spray aggravated his asthma and caused lesions on his scalp as well as lingering skin pain. He asserts that he also continues to suffer mental and emotional anguish about the incident. ECF 1 at pp. 7, 12.

Plaintiff contends the use of force was "without penological justification" and exceeded "any reasonable need as such may sometimes exist in a prison setting." *Id.* at p. 6. Plaintiff claims Ziler, Barb, Frazee, Donaldson, and Robey subjected him to excessive force in violation of the Eighth Amendment and Maryland Law. ECF 1 at p. 6. Further, he claims Ziler, Barb, Frazee, Donaldson, and Robey "worked together" to conspire and retaliate against him for attempting to file an ARP about employee use of tobacco in state buildings. *Id.* at p. 7. Plaintiff also claims

---

[5] Plaintiff was examined by medical providers on January 26, 2017, after the incident. ECF 17-2 at pp. 5-6; ECF 10-2 at pp. 3, 5.

Ziler, Barb, Frazee, Donaldson, and Robey violated his right under the First Amendment to petition for redress through the prison ARP process by singling him out after observing him with an ARP form.[6] *Id.* at p. 10. He is suing Ziler, Barb, Frazee, Donaldson, and Robey in their official and individual capacities for punitive and compensatory damages. *Id.* at pp. 7–10.

The Internal Investigation Division (IID) was notified of the incident. ECF 24-32 at p. 12. The IID case (IID Case No. 17-35-00172) was assigned to Det. Sergeant Corey McKenzie, and later reassigned to Det. Sergeant Likin for investigation. ECF 24-32 at p. 12. In the institutional reports Chief of Security Bradley Butler determined the incident was a spontaneous response by officers with less than lethal use of force. Butler and Warden Graham concluded correctional staff had acted in accordance with the Department of Public Safety and Correctional Services (DPSCS) Use of Force (UOF Manuel), but staff were advised to evaluate their surroundings and gather adequate staff to control a situation prior to entry. ECF 24-5 at pp. 3–4. Plaintiff and Fitzgerald refused to give statements after the incident.[7]

Detective Likin, the IID investigator, reviewed institutional reports and the surveillance video, noting the incident was only partially captured on the surveillance video due to the position of the cameras. He noted that the video shows Ziler falling to the ground and staff coming to assist him, but not the full incident. ECF 24-32 at p. 12. Likin made an application for a statement of charges against plaintiff, and the Allegany County District Court Commissioner issued a criminal summons charging him with three counts of second degree assault on a Department of Correction

[6] Plaintiff filed ARP-NBCI-791-17 complaining that correctional officers use tobacco products in violation of a ban on such products and exposed him to harmful effects. ECF 24-33 at p. 1. He appealed to the Inmate Grievance Office (IGO). On December 19, 2017, the IGO administratively dismissed the grievance for failure to state a claim upon which administrative relief can and should be granted and noted the complaint would be forwarded to the Internal Investigative Division (IID) to investigate plaintiff's allegations of staff contraband. ECF 31-2 at p. 5.

[7] The documents state "Inmate refused to give statement." ECF 24-5 at pp. 20–21. The documents are unsigned by plaintiff, Fitzgerald, or a correctional officer who witnessed the refusals. *Id.*

employee. ECF 24-21 at p. 13. Likin concluded no further investigation was needed and requested the case be closed. ECF 24-32 at 14; ECF 24-32 at pp. 124–27 (Dist. Ct for Allegany County, Crim Case D-121-CR-17-000266); *see also supra* n. 4.

Plaintiff was also served with a Notice of Inmate Rule Violation for violating Rules 100 (engaging in a disruptive act) and 101 (assault or battery on staff). ECF 24-5 at p. 22.[8] Plaintiff told the hearing officer that on January 26, 2017, he noticed Barb spitting chewing tobacco into a cup and placing it in the trash can. Barb then walked into the "institutional bubble." ECF 24-29 at p. 4. Fitzgerald went to the trash can to get the cup with the tobacco. Ziler tapped on the window and asked what they were doing. Plaintiff responded they were not doing anything. At 12:30, plaintiff went to the recreation area, and started showing other inmates the tobacco and ARP. At about 1:15, officers came on the tier. Donaldson took out the trash bag and started to search it. Ziler asked the inmates whether they were having a meeting and asked plaintiff to step out to the tier to talk. Plaintiff asked why because he did not do anything. Then Ziler pulled out a mace can and pointed it at plaintiff. Plaintiff denied doing anything and returned to the day room to watch television. Plaintiff said Ziler followed him, asked him where the tobacco was, and lunged at him. Plaintiff moved out of the way and fell against a wall. Then another officer used pepper spray on him and plaintiff took off his shirt. ECF 24-29 at pp. 4–5.

The hearing officer found after reviewing the Notice of Infraction and supporting documents that plaintiff was guilty of violating Rules 100 and 101. Plaintiff received 300 days of

---

[8] Plaintiff moved to dismiss the charges against him because his hearing was held more than seven days after he was charged. The hearing officer denied the request because the hearing was postponed because plaintiff had requested video footage and other evidence that needed to be collected. ECF 24-29 at p. 3. In his Motion to Add Additional Evidence, plaintiff requests to file the record from his disciplinary hearing. Because these records are already part of the record, the motion will be denied. ECF 36, ECF 36-1

segregation confinement and his visitation privileges were revoked indefinitely. ECF 24-29 at pp. 5–6

Plaintiff alleges that defendant Officer Fann interfered with his medical care by not escorting him to the chronic care clinic on February 21, 2017. ECF 1 at p. 14–15. Plaintiff asserts that when he asked the officer his name, Fann initially gave him a false name and commented "Robey is a good buddy of mine," which plaintiff understood to mean that he was refusing the escort on Robey's behalf. *Id.* at p. 15. Plaintiff wanted to see a provider in the chronic care clinic to explain he needed an asthma inhaler since the one he had was depleted. *Id.* at 15. As relief, plaintiff asks for punitive damages against Fann for violating his rights under the Eighth Amendment, "Maryland laws and Departmental regulations." *Id.* at p. 16.

Fann denies refusing to provide his name or providing a false name to plaintiff. Fann Aff. ECF 24-25. According to Fann, on February 21, 2017, plaintiff chose to participate in outdoor recreation rather than attend his medical appointment. *Id.* Fann states he has not been involved in, interfered with or delayed plaintiff's medical care, nor has he ever harassed, threatened, conspired or retaliated against plaintiff and has no knowledge of other staff members doing so. ECF 24-25.

Plaintiff alleges that when Sgt. Thomas escorted him from WCI to NBCI on January 26, 2017, Thomas told him that he was being taken to a "state sponsored hell especially built for guys like you who like to rabble rouse and fight officers." ECF 1 at p. 21. Plaintiff claims he was placed in a "contingency" cell without running water, the window was locked shut, and the toilet did not work. He was not provided with toilet paper, a mattress or bed linen. A plexiglass barrier positioned around the cell door further prevented the flow of air into the cell and there was no other means of ventilation. *Id.* Plaintiff alleges he had difficulty breathing due to his respiratory

8

condition, which was aggravated by his exposure to pepper spray, and lack of air flow. He claims to have "passed out" twice due to these conditions. *Id.* at p. 22.

Plaintiff also claims he was denied food on January 26, 2017, and from "January 26th through January 31st" his food was thrown on the cell floor. *Id.* For five days, he had no soap, toothpaste, toilet paper, wash cloths, deodorant, running water, or out-of-cell activity. He claims the cell smelled of human excrement causing him to vomit whenever he tried to eat.

Plaintiff claims that Officer Marchinke told him sick call procedures were unavailable to him "per orders of Sgt. Thomas." *Id.* Plaintiff is suing Sgt. Thomas for damages for subjecting him to unconstitutional conditions of confinement, denying him access to medical care in contravention of the Eighth Amendment, the Equal Protection Clause, made applicable by the Fourteenth Amendment, the Maryland Bill of Rights, and Departmental regulations. *Id.* at pp. 22-23.

Thomas disputes plaintiff's assertions and denies ever instructing a correctional officer to prevent or interfere with plaintiff's access to the sick call process. ECF 24-14. Further, he denies interfering with or delaying medical care to plaintiff, and states he has no knowledge of any custody staff under his supervision doing so. *Id.* Thomas states that when he escorted plaintiff from WCI to NBCI, the escort was uneventful and he was unaware of the reasons for plaintiff's transfer. *Id.* Thomas recalls that the plaintiff did not ask him for a decontamination shower, nor was he aware that plaintiff requested one from another correctional officer. Thomas explains plaintiff was placed on Staff Alert Status upon arrival at NBCI. ECF 24-14; ECF 24-18 at p. 1; ECF 24-19. Inmates who pose a substantial threat to institutional security or staff may be temporarily placed in this status no longer than it takes to modify the behavior. ECF 24-14.

9

Thomas asserts NBCI does not designate or use a specific area in the institution as a "contingency cell." ECF 24-14 ¶ 11; ECF 24-24.

Thomas explains that Staff Alert is a status, not a housing location. During the time plaintiff was on staff alert, he was placed in Housing Unit 1, Cell 1-C-22. ECF 24-14. Cells used for Staff Alert status inmates may have a plastic security barrier placed in front of the cell to limit an inmate's ability to throw feces and urine at corrections officers. Further, and contrary to plaintiff's assertions, the ventilation system in the housing units at NBCI cannot be shut off as to individual cells and the window in his cell was not locked. *Id.* Thomas states water to individual cells may be temporarily shut off when the occupant has a history of or makes threats of clogging the drainage system with the intent of flooding the cell or tier. Temporarily shutting off the water to an inmate's cell is not done to retaliate or punish the inmate. [9]

Cells housing inmates on staff alert status may use a security pass through, a device attached to the cell which allows staff to safely pass items through the feed slot and avoid physical contact with the inmate. Bagged meals and medications are secured in the security pass through for the inmate. Staff Alert security procedures require the inmate to move to the back of the cell, face the back wall, and kneel while the feed-up slot is opened. A refusal to follow these procedures is considered a refusal of medication or meals by the inmate. Toiletries and clean clothes are provided to inmates on Staff Alert status as needed. ECF 24-14 ¶ 11. The record indicates that plaintiff refused to follow these procedures and therefore declined his meals. ECF 24-14 ¶12; ECF 24-20 at pp. 4–5. On January 31, 2017, plaintiff was removed from Staff Alert Status, after he was observed to be following staff directions and procedures. ECF 24-19; ECF 24-20 at p. 4; ECF 24-21 at p. 1

---

[9] Thomas does not address whether the water was shut off in plaintiff's cell or if he had a history of flooding the tier.

On July 13, 2017, plaintiff met with Lt. Iser after family members called the Warden with concerns about his welfare. ECF 1 at p. 23. According to Plaintiff, Iser said, "Off the record, yeah you should have been provided a decontamination shower, according to official rules, and yeah that cell is pretty rough but at NBCI there's a policy on paper and then there's the real life policy." *Id.* at pp. 24–25. Iser continued "We have a policy of making life a living hell for guys like you who go against officers," and family calls will not help because "we know how to cover ourselves pretty good." *Id.* at 25.

When plaintiff told Iser about Fann "falsely" stating that he had refused medical treatment in the chronic care clinic, Iser replied "Yeah I imagine he did." *Id.* Plaintiff then told Iser that he had gone for weeks without his inhaler after arriving at NBCI. Iser said "Look, I know all about your rough time but crying about it ain't gonna help, you're alive, be happy." *Id.* Plaintiff is suing Iser for punitive and compensatory damages under the Eighth Amendment, the Equal Protection Clause, the Maryland Bill of Rights, and "Departmental regulations" for authorizing, arranging, and knowingly in his supervisory capacity allowing subordinates to violate his rights by inflicting cruel and unusual punishment. *Id.*

Lt. Iser denies that he has harassed, threatened, conspired against or retaliated against plaintiff and counters that he has no knowledge anyone under his supervision has done so. Iser also denies interfering with or delaying medical or mental health care to plaintiff and has no knowledge that anyone under his supervision has done so. Further, he denies that when he met with plaintiff on July 13, 2017, or at any other time, they discussed whether or not he had received a decontamination shower upon his transfer to NBCI on January 26, 2017. ECF 24-31.

Plaintiff is suing Commissioner Corcoran for punitive and compensatory damages for violating his rights under the Eighth Amendment, the Maryland Bill of Rights, and "Departmental

regulations" by allowing, sanctioning, and approving NBCI employees'·· use of "draconian measures" represented by his experience in the contingency cell. ECF 1 at 25. Additionally, plaintiff asks to be transferred to a prison outside of Cumberland, Maryland to protect him against reprisal and for an investigation of the contingency cells at NBCI. [10] *Id.* at 26.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

---

[10] Plaintiff also asks for DPSCS supervisory medical staff to investigate NBCI's medical staff and to educate them on the proper protocols for delivery of medical care. ECF 1 at p. 26.

Plaintiff has filed a declaration stating his need to see the video footage to show he went without a mattress, bed linens, a pillow or hygiene items during the time he was on staff alert status. ECF 31-1. Plaintiff also asks for a copy of the Use of Force Manual, to depose defendants as well as Samiyah Hassan, who verified the IGO records submitted by the State Defendants. ECF 31-1. As discussed below, even assuming plaintiff's claims he went without a mattress, a pillow, or hygiene items for a five-day period while on staff alert status are true, the claim does not state an Eighth Amendment violation. *See, e.g., Lowery v. Bennett*, 492 F. App'x 405, 407 (4th Cir. 2012) (ten-days on strip-cell confinement without "personal hygiene items, religious books, mattress, bedding, towels, and clothing" not unconstitutional)

## DISCUSSION

The defendants assert, among their arguments in support of their dispositive motion, lack of exhaustion and qualified immunity.

### I.   Exhaustion

The defendants assert the affirmative defense that plaintiff has failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (2012):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

*Id.*

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendants. *See Jones v. Bock*, 549 U.S. 199, 215–16 (2007); *see also Anderson v. XYZ Correctional Health Servs., Inc.*, 407 F.3d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may

not be considered by this court. *See Bock*, 549 U.S. at 219–20. In other words, exhaustion is mandatory. *Ross v. Blake*, 136 S.Ct. 1850, 1856–57 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")).

A prisoner must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 725, 729 (4th Cir. 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). But, the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Notably, plaintiff does not allege in the complaint that the process was unavailable to him.[11]

In Maryland a prisoner must file an ARP with the warden within 30 days of the incident at issue. Md. Code Regs. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B)

---

[11] Plaintiff did, however, claim in NBCI ARP-576-17 that he "strongly" feels his ARPs "are being thrown way," but identified no staff who were responsible. ECF 24-37 at p. 1. Between February 12, 2017 and April 26, 2017, plaintiff filed nine ARP complaints. ECF 24-44. In 2017, he filed twenty-nine ARPs, thereby casting doubt on any suggestion he was denied access to the ARP process or his ARPs were thrown away. *Id.*

(setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. Md. Code Regs. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office (IGO). *See* Md. Code. Ann., Correctional Servs. §§ 10-206, 10-210 (West 2002); Md. Code Regs. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. *See* Md. Code Ann., Corr. Servs. § 10-210(a). The ARP process does not apply to case management decisions, which are[12] to be directly grieved to the IGO. Md. Code Regs. 12.02.28.04(B)(1); 12.07.01.04(B)(9)(c).

While a prisoner may pursue the ARP process to allege that correctional officers used excessive force, such ARPs may be procedurally dismissed if the IID has decided to investigate the use of force incident at issue in the ARP. Md. Code Regs. 12.01.28.11(B)(1)(h). If this procedural dismissal indicates that no further action may be taken through the ARP process, a prisoner ostensibly could file a grievance directly with the IGO, as there would be no further administrative remedies available through the ARP process. Thus, in regard to ARP NBCI-0334-17[13] in which plaintiff alleged he was assaulted by staff at WCI on January 26, 2017, and which was procedurally dismissed because the matter had been referred to the IID, the court finds this claim is not subject to dismissal for failure to exhaust administrative remedies. ECF 24-1 p. 21 n.16; ECF 24-33.

---

[12] Plaintiff also filed ARP NBCI-533-17 in which he complained that he was not given his allowable property for thirteen days after his transfer to NBCI on January 26, 2017. The IGO decision noted that the Warden had already found the complaint meritorious, he had been provided his property, and plaintiff was entitled to no further relief. ECF 31-2 at p. 7.

[13] *See also* ECF 24-37 at pp. 4–7.

Defendants argue that plaintiff filed three other ARPs relevant to this case, and of these only one, IGO No. 20171434 (an appeal from ARP NBCI-1205-17), concerning the denial of a mattress and pillow when he arrived at NBCI on January 26, 2017, was filed with the IGO. Decl. of Samiyah Hassan, IGO Administrative Officer, ECF No. 24-38; ECF 24-33; *see also* ECF No. 31 at p. 22. The IGO dismissed the grievance on October 23, 2017, for failure to state a claim upon which administrative relief can be granted. ECF No. 24-38.

On March 6, 2017, plaintiff filed ARP NBCI-462-17, asserting that Fann falsely reported that he had refused to go to sick call and was not wearing his uniform so he could see his name. Plaintiff was instructed to resubmit the ARP with additional information, but he failed to comply. On March 15, 2017, the ARP was dismissed. On appeal, the IGO dismissed the grievance for failure to follow the ARP coordinator's instructions. ECF 24-36 at p. 4.

On March 15, 2017, plaintiff filed ARP NBCI-576-17, alleging he did not receive a shower or his property for 13 days after his transfer from WCI to NBCI on January 26, 2017. The ARP was procedurally dismissed at the institutional level on March 15, 2017, and dismissed on appeal on April 7, 2017, as repetitive to ARP NBCI-333-17. ECF 24-33; ECF 24-37.

On February 9, 2017, plaintiff filed ARP NBCI-320-17, alleging that between January 26, 2017 and January 31, 2017, his food was either thrown on the floor or into the cell by different correctional officers "as [if ] he was a dog," and he was denied meals on January 26, 2017 (the Warden's response also states that plaintiff claims he was denied meals on January 27 and January 31, 2017). ECF 24-34 at pp. 1-3. On March 19, 2017, the ARP was dismissed after investigation found that plaintiff had refused to follow staff alert procedures for meals. Further, records and surveillance footage showed that plaintiff had in fact received meals on January 27, 2017 and January 31, 2017. *Id.* at pp. 1, 3–16. Plaintiff appealed, and on August 21, 2017, Commissioner

Corcoran dismissed the ARP Appeal, stating that the ARP had been investigated and fully addressed by the warden, and plaintiff provided no additional evidence to substantiate his claim. *Id.* at p. 18.

In light of the above, the court shall deem plaintiff's claims of excessive force and the denial of a pillow and mattress when he arrived at NBCI on January 26, 2017, as exhausted. His remaining claims, however, have not been fully presented through the administrative process. However, even if the unexhausted claims had been exhausted, they would be unavailing for reasons discussed below.

## II.    Qualified Immunity

"The doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer,* 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001)); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The qualified immunity doctrine serves two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). In the absence of any substantive argument applying the law to the record evidence, defendants' generally stated recitation of the law of qualified immunity is insufficient for this court to determine whether the they are entitled to qualified immunity.

## III.    Claims against Officers Ziler, Barb, Frazee, Donaldson, and Robey

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers,* 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy,* 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillian,* 503 U.S. 1, 7–9 (1992). "In its prohibition of 'cruel and unusual

17

punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). The use of force by a prison official violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the conscience of mankind.'" *Wilkins*, 559 U.S. at 38 (citation omitted).

Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The question of use of excessive force turns on the totality of the circumstances. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). The use of force must be considered "in full context." *Smith v. Ray*, 781 F. 3d 95, 101 (4th Cir. 2015) (citation omitted). Notably, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (citation omitted). The absence of "significant" injury is not dispositive of a claim of excessive force. *Id.* at 36–37. If force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] has the good fortune to escape without serious injury." *Id.* at 38. In other words, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment. *Id.* at 38–40. But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation. In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7). Thus, a court must look at "the nature of the force rather than the extent of the injury. " *Id.* at 34.

18

Prison officials are charged with balancing competing governmental interests. These include the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 320. When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6; *see also Smith v. Ray*, 781 F.3d at 101 (analyzing an excessive force claim under the Fourth Amendment and stating: "In considering the reasonableness of an officer's actions, we must consider the facts at the moment that the challenged force was employed."); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6 (citations omitted).

Where pepper spray is used by prison staff, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted). It may be used in order to control recalcitrant inmates. *Williams*, 77 F.3d at 763. As noted, Bryant-El pled guilty to assaulting staff, but the court does not have enough undisputed evidence to determine whether the use of pepper spray was excessive in regard to the specific facts of the assault. The inquiry focuses, as with all other excessive force claims, on whether the defendant acted with a sufficiently culpable state of mind. *Iko*, 535 F.3d at 238.

Defendants filed two DVD[15] recordings of the January 26, 2017 incident. ECF 24-6; ECF 24-7. On December 21, 2018, plaintiff viewed the video recordings of the incident, Decl. of C.O II Benjamin Bradley, ECF 27-1, and references it in his Opposition. ECF 31 at pp. 5, 7. The court has viewed the DVD recordings, which show views from the tier and the recreation room, and finds the information provided is insufficient to grant the defendants' Motion for Summary Judgment as to the excessive force claim. The video shows a gathering of inmates inside the recreation room, several of whom are gathered around plaintiff, who is holding a paper in his hand. ECF 24-7. Twice officers are seen inspecting a trash can near the doorway of the room, which suggests they may have been looking for the tobacco as plaintiff alleges. The video does not show an officer pointing a can of pepper spray directly at plaintiff while another officer pulled the trash bag from the can in the recreation room, as plaintiff asserts. Several officers enter the room and appear to have a short dialogue with plaintiff. Plaintiff, who is not handcuffed, follows them out of view of the camera. Moments later, plaintiff runs back into the recreation room, removes his shirt, which is now stained orange, and wipes his face. *Id.* Plaintiff is not restrained. The recording then shows Plaintiff moving about the recreation room on his own accord after the pepper spray exposure. Plaintiff's movements do not suggest he was having difficulty seeing, walking, or breathing. No pepper spray can be discerned on his scalp or face. Another recording taken from the tier view shows an officer fall to the ground. Afterwards, the recording shows plaintiff, who walked on his own accord, being escorted away. *Id.*

Plaintiff asserts he was handcuffed at the time of the incident, which is belied by the DVD. The DVD, however, provides little useful information on the issue of excessive force because the actual use of force incident was not in view of the cameras. Fitzgerald's declaration

---

[15] There is no sound on the recording.

supports plaintiff's allegations that the officers threatened "to light him up" and that Ziler lunged at plaintiff, who "appeared to fall away to avoid being hit." ECF 1-1 at p. 2. Further, Fitzgerald states he saw plaintiff "being continuously sprayed" by three correctional officers even though Fitzgerald "never saw [plaintiff] attack or even try to hit anyone," although Fitzgerald does not name the correctional officers. *Id.* Barb and Robey admit to using pepper spray in their sworn declarations. ECF 24-9 ¶ 4; ECF 24-13 ¶ 4.

In regard to Robey, Barb, and Ziler, each side presents fundamentally different versions of the incident, and the court may not resolve factual disputes in the context of a summary judgment motion. As stated earlier, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). In the face of conflicting material evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. In regard to Donaldson and Frazee, however, plaintiff provides no verified evidence that they used force against him.

Accordingly, the court will deny the Motion for Summary Judgment as to plaintiff's claims of excessive force against Robey, Barb, and Ziler, and grant the Motion for Summary Judgment as to plaintiff's claims of excessive force against Donaldson and Frazee.

## IV. Claims Against Fann

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). In an Eighth Amendment suit alleging denial of adequate medical care, a plaintiff must show the defendant's actions or inaction amounted to deliberate indifference to a plaintiff's serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1984). The subjective component examines whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To establish an Eighth Amendment claim for deliberate indifference to an inmate's serious medical need, an inmate must to show that the correctional official (1) failed promptly to provide needed medical care; (2) "deliberately interfered with the prison doctors' performance"; or (3) "tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

Here, Fann denies in his declaration that he refused to escort plaintiff to the chronic care clinic, tried to conceal his name, interfered with or delayed his medical care, or acted against plaintiff with unlawfully retaliatory animus. ECF 24-25. Further, plaintiff does not allege that he asked Fann or any other staff member for a decontamination shower. Plaintiff offers no declaration

22

or similar evidence to dispute Fann's assertion that he was unaware plaintiff needed medical attention. Accordingly, the court will grant summary judgment in favor of Fann.

### V.    Claims Against Sergeant Thomas

Plaintiff's claims against Thomas concern his conditions of confinement in staff alert status and Thomas's alleged interference with plaintiff's access to sick call procedures. The record evidence establishes that plaintiff was placed on Staff Alert status between January 26 and January 31, 2017.

"Since 'routine discomfort' is part of prison life and 'society does not expect that prisoners will have unqualified access to health care,' in order to demonstrate the objective component of conditions-of-confinement or medical care claims prisoners must demonstrate 'extreme' deprivations or neglect of 'serious' medical needs." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992)). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "a serious or significant physical or emotional injury resulting from the challenged conditions." *See Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 634).

Plaintiff has failed to demonstrate the extreme deprivations required. *See, e.g., Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019) ("The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day 'alone, in a small ... cell' with 'no access to congregate religious, educational, or social programming'—pose a 'substantial risk' of serious psychological and emotional harm.") (citation omitted); *Scinto v.*

*Stansberry*, 841 F. 3d 219 (4th Cir. 2016) (genuine issue of material fact whether denial of insulin to diabetic prisoner was an "'extreme deprivation' resulting in 'a serious or significant physical or emotional injury'") (citation omitted). Here, plaintiff was placed on a temporary staff alert status where the conditions, while uncomfortable, do not approach the extreme deprivations required to support an Eighth Amendment claim, given that courts have found similar or more extreme deprivations to be constitutional. *See, e.g., Lowery*, 492 F. App'x at 407; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (rejecting Fourteenth Amendment challenge brought by inmates placed in administrative segregation for six months who experienced extreme temperatures, in addition to unsanitary cells and limited portions of food); *Williams v. Delo*, 49 F.3d 442, 444–45 (8th Cir. 1995) (four days without clothes, mattress, water, bedding, legal mail or hygienic supplies not a violation of Eighth Amendment). Thus, assuming plaintiff's description of the cell is true, plaintiff's exposure to those conditions does not support a constitutional claim against Thomas. Further, even if the conditions were extreme, plaintiff also fails to produce evidence of a serious or significant physical or emotional injury resulting from the challenged temporary conditions.

Lastly, plaintiff alleges Thomas violated his rights under the Equal Protection Clause. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). The key to an equal protection claim requires a showing "that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1047, 1051–52 (8th Cir. 1998). Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause . . . . must still be analyzed in light of the special security and management concerns in the

24

prison system."[16] *Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2001) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."). Plaintiff does not allege or suggest facts to show that he has been treated differently from others similarly situated to him for an unlawful reason. For these reasons, summary judgment will be granted as to the claims against Thomas.

VI.    **Claims Against Lieutenant Iser**

Plaintiff claims Iser authorized, arranged, and knowingly allowed subordinates to violate his rights by inflicting cruel and unusual punishment and that Iser violated his right to equal protection.[17] Iser disputes these assertions and denies any knowledge of or involvement in unconstitutional conduct directed at plaintiff. Plaintiff fails to dispute Iser's declaration with any sworn document. In the absence of a genuine dispute of material fact, the court will grant summary judgment in favor of Iser.

VII.    **Claims Against Dayena Corcoran**

Plaintiff alleges Corcoran is liable because she allowed, sanctioned, and approved NBCI employees' use of "draconian measures" represented by his experience in the "contingency cell." ECF 1 at p. 25. For liability to exist under 42 U.S.C. § 1983, a defendant must be personally involved in the alleged violation. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Plaintiff does not allege Corcoran was involved in or

---

[16] A prisoner's rights under the Constitution must not be inconsistent with his or her status as a prisoner. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 409–10 (1989).

[17] Plaintiff again provides no factual basis for his equal protection claim against Iser.

25

had knowledge of his assignment to staff alert status or the conditions of his cell. Instead, he appears to claim Corcoran is culpable on the basis of her status as a supervisor, or on a theory of respondeat superior. However, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983)

Supervisory liability for the unconstitutional acts of employees may attach under § 1983 if a plaintiff can establish three elements: (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'" and (3) "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (citations omitted). Plaintiff's broad and conclusory allegations are insufficient to find Corcoran culpable based on supervisory liability. Accordingly, the court will grant summary judgment in favor of Corcoran.

## CONCLUSION

For these reasons, the court will by separate order, grant in part and deny in part defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF 24. The court will grant the Motion for Summary Judgment as to defendants Corcoran, Fann, Iser, Thomas,[18] Frazee, and Donaldson, and deny the Motion for Summary Judgment as to defendants Ziler, Robey, and

---

[18] It is unclear what state laws or departmental regulations plaintiff is asserting that Corcoran, Fann, Thomas, and Iser have violated. To the extent plaintiff may state claims against Corcoran, Fann, Iser, or Thomas premised on Maryland law and departmental regulation, the court declines to exercise supplemental jurisdiction over such claims and dismisses them without prejudice.

Barb. The court will grant plaintiff's Motion for Appointment of Counsel. ECF 35. The Motion to Present Additional Evidence (ECF 36) will be denied as moot. A separate order follows.

9/11/19
Date

Catherine C. Blake
United States District Judge